UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 010-342 (JRT/FLN)

Barbara Wallace,

                    Plaintiff

          v.                                    **REPORT AND**
                                                **RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

                    Defendant
_____

Lionel H. Peabody, Esq., for Plaintiff
Lonnie F. Bryan, Assistant United States Attorney, for Defendant
_____

Plaintiff Barbara Wallace seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who denied her application for disability insurance benefits

("DIB").   See 42 U.S.C. § 1382(c).   The matter was referred to the undersigned United States

Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g).   The parties submitted

cross-motions for summary judgment.   (Doc. Nos. 11, 18.)   For the reasons which follow, this Court

recommends that Plaintiff's motion for summary judgment be **DENIED**, and Defendant's motion

for summary judgment be **GRANTED**.

1

## I.   INTRODUCTION

Previously, the Social Security Administration found Plaintiff disabled from August 1992 through June 2000, with cessation of benefits at the end of July 2000. (Doc. No. 5, Administrative Record [hereinafter "Tr."] at 17.)[1] Plaintiff filed a new application for DIB on December 1, 2005. (Tr. 102-06). She alleged onset of disability on August 1, 2000. (Tr. 117.) Plaintiff's date last insured is December 31, 2004. (Tr. 17.) Plaintiff's application was denied initially and upon reconsideration. (Tr. 72-76, 80-82.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on October 23, 2007. (Tr. 83, 19-67.) On December 11, 2007, the ALJ issued a decision denying Plaintiff's claims. (Tr. 7-18.) The Appeals Council denied Plaintiff's request for review on December 22, 2009 (Tr. 1-4), making the ALJ's decision final for purposes of judicial review. See 20 C.F.R. § 404.981. Plaintiff commenced this action seeking judicial review of the Commissioner's decision on February 8, 2010.

## II.   STATEMENT OF FACTS

### A.   Background

Plaintiff alleges disability from the following impairments: degenerative disc disease, chronic obstructive pulmonary disease ("COPD"), and lung cancer. (Tr. 121.) Plaintiff's birthday is November 26, 1950, and she was fifty- years-old on the onset date, August 1, 2000. (Tr. 102.) She has a high school education and nurse's aid training. (Tr. 126.) She was a nurse's aid from 1980-1991. (Tr. 122.) Plaintiff quit her job due to back pain. (Supp. Tr. 617.) The following year, in August 1992, she was diagnosed with cancer in her right arm. (Id.) Due to the type of cancer,

---

[1]     She was found disabled from degenerative disc disease and cancer of the right arm. (Doc. No. 9, Supplemental Administrative Record at 738.)

leukemia was expected to follow, but ultimately it did not.  (Tr. 570.)  In 1996, Plaintiff had a total

left hip replacement.  (Supp. Tr. 745-47.)  In 2005, Plaintiff was diagnosed with lung cancer.  (Tr.

252-53.)

**B.     Prior Disability and Medical Improvement**

Plaintiff was diagnosed with spontaneous right brachialis muscle compartment syndrome[2]

in August 1992, and underwent a right arm fasciotomy with brachialis debridement and brachial

radialis fasciotomy.[3]  (Doc. No. 9, Supplemental SSA Administrative Record ("Supp. Tr.") at 515.)

After biopsy, she was diagnosed with granulocytic sarcoma.[4]  (Supp. Tr. 532.)  Plaintiff completed

radiation therapy on September 23, 1992.  (Supp. Tr. 549.)  Plaintiff was granted disability by the

Social Security Agency as of August 1992.  (Tr. 17.)

Nineteen months later, in April 1994, Plaintiff was diagnosed with major depressive episode.

(Supp. Tr. 617-19.)  Approximately two and a half years later, in October 1996, Plaintiff had

reconstructive left total hip arthroplasty[5] to treat severe degenerative arthritis and congenital hip

dysplasia.  (Tr. 745-47.)

---

[2]     Brachial means pertaining to the upper limb.  Dorland's Illustrated Medical
Dictionary ("Dorland's") 247 (31st ed. 2007).  Compartment syndrome is a pathologic condition
caused by the progressive development of arterial compression and reduction of blood supply.
Mosby's Medical, Nursing & Allied Health Dictionary ("Mosby's") 373 (5th ed. 1998).

[3]     Fasciotomy is surgical incision of the fascia, a sheet or band of fibrous tissue,
often performed to release pressure in compartment syndrome.  Dorland's 687, 693.

[4]     A granulocyte is any cell containing granules or small particles.  Dorland's 813-
14.  Sarcoma is any of the group of tumors usually arising from connective tissue.  Dorland's
1693.

[5]     Arthroplasty is plastic surgery of a joint(s).  Dorland's 160.

Several years later, in April 1999, Plaintiff was treated for severe chronic obstructive pulmonary disease and bronchospasm.  (Tr. 757-58.)     Then, in December 1999, Plaintiff underwent a consultative physical examination with Dr. Franklin Johnson at the request of the Social Security Administration.  (Tr. 788-89.)  Dr. Johnson stated:

> It would appear that this client has experienced dramatic improvement in her situation since her original disability exam, in that her destructive hip disease has been corrected by the total hip, increasing her ambulation.  Her depression is resolved subsequent to decrease of cancer, and she has no evidence of the sarcoma which was previously new, and its prognosis was unknown at the time of her previous exam.  Also, her ambulation could be significantly improved if she would reduce her weight.  Overall, the patient has demonstrated significant medical improvement, in my estimation, since her original exam.

(Tr. 789.)  Dr. Johnson also noted that Plaintiff spent a "good deal" of time caring for her four grandchildren.  (Tr. 788.)

Plaintiff also underwent a psychological consultative examination with Dr. Marcus Desmonde at the request of the Social Security Administration in February 2000.  (Supp. Tr. 793-97.)  Plaintiff reported her history of cancer and subsequent depression.  (Supp. Tr. 794.)  She stated that her recuperation from hip replacement in 1996 lasted for six to eight months.  (Id.)  She had been unable to quit smoking and had periodic flare-up of COPD.  (Id.)  She denied any current significant symptoms of depression or anxiety.  (Id.)

Plaintiff described her typical day.  (Supp. Tr. 795.)  She often babysat for her grandchildren during the day.  (Id.)  When not babysitting, she sewed.  (Id.)  She was very active because she had three sons and four grandchildren who lived in the area.  (Id.)  Otherwise, she did not get out much because she felt uncomfortable around others due to her body image.  (Id.)  Plaintiff was concerned about losing disability benefits and considered herself disabled.  (Id.)  She also considered her

4

excessive weight as a factor in her "ability to get around" and the source of her knee pain.  (Supp. Tr. 796.)  Dr. Desmonde diagnosed alcohol dependence in sustained full remission; nicotine dependence, continuous; mood disorder secondary to general medical condition with chronic depressive features; major depressive disorder, single episode by history; and he assessed a GAF score of 50-65 in the last six months.  (Supp. Tr. 796-97.)

On February 23, 2000, the Disability Determination Services referred Plaintiff to Dr. A. Neil Johnson for pulmonary function studies and a chest x-ray.  (Tr. 365-69.)  Dr. Johnson noted that Plaintiff was 62" tall and weighed 230 pounds.  (Tr. 365.)  Plaintiff's FEV-1[6] before bronchodilators[7] was 1.6, 1.6, 1.6, 1.5, 1.5.  (Id. and 369.)  Her VC[8] before bronchodilators was 2.9, 2.5, 2.6, 2.7, 2.4.  (Id.)  After bronchodilators her FEV-1 was 1.7.  (Id.)  After bronchodilators, her VC was 2.6, 2.8, 2.8, 2.8, 2.8 and 2.6.  (Id.)  Plaintiff's lungs were clear on chest x-ray.  (Tr. 367.)  On March 30, 2000, in a Social Security Disability Medical Consultant's Analysis, Dr. Carole Rosanova wrote, "[t]his 49-year-old woman's benefits were ceased for medical improvement in her osteoarthritis and later effects of musculoskeletal and connective tissue.  She was originally allowed for degenerative disc disease of the lumbar spine and sarcoma of the right arm."  (Supp. Tr. 738.)

### C.      Medical Records During the Relevant Time frame

---

[6]      FEV means forced expiratory volume.  Dorland's 699.

[7]      Bronchodilators are agents that cause an expansion of the lumina of the air passages of the lungs.  Dorland's 256.  An example is albuterol sulfate.  Physician's Desk Reference (65th ed. 2011).

[8]      VC stands for vital capacity.  Dorland's 2056.

Plaintiff saw Dr. H. Chris Chapman at Duluth Clinic, West Family Practice on October 6, 2000, and reported symptoms of sinus pain and drainage, sudden onset of emotional upset, rage, fear, floating, light-headed, fast heart rate, and feeling out of control.  (Tr. 207.)  Plaintiff denied prior treatment for panic attacks.  (Id.)  Dr. Chapman assessed right-sided sinusitis, and recommended testing for menopause, and if negative; he would prescribe Paxil for panic-related disorder.  (Tr. 208.)

On October 31, 2000, Plaintiff saw Dr. Chapman and complained of weakness of the left shoulder, and she could not lift her left arm above her shoulder.  (Tr. 206-07.)  Dr. Chapman noted Plaintiff's history of chronic COPD secondary to tobacco abuse and granulocytic sarcoma, mainly involving her right forearm, with prior excision.  (Id.)  On examination, there was questionable weakness of the biceps reflex but "impressive" individual muscle strength of the arm and intact hand and wrist grip strength.  (Id.)  Triceps strength appeared intact but biceps and deltoid function on the left was weak compared to the right.  (Id.)  Plaintiff could only abduct her arm to eighty degrees but with no limitation of motion and no pain.  (Id.)  X-rays of the neck and chest were normal.  (Id. and Tr. 211-14.)  Dr. Chapman ordered an MRI to rule out the remote possibility of tumor.  (Tr. 207.)

Plaintiff went to St. Mary's Medical Center on December 7, 2000, for evaluation of urinary frequency and flank pain.  (Tr. 192-96.)  Plaintiff was diagnosed with urinary tract infection, probable pyelonephritis.[9]  (Tr. 192.)  Plaintiff was prescribed Pyridium, Levaquin and Lortab.  (Id.)

---

[9]     Pyelonephritis is inflammation of the kidney and renal pelvis because of bacterial infection.  Dorland's 1582.

Approximately three weeks later, Plaintiff saw Dr. Chapman for follow up on pyelonephritis. (Tr. 204-05.) Plaintiff's symptoms had resolved. (Tr. 205.) Dr. Chapman also noted the following: "Barb's left arm, which previously had episode of acute biceps and deltoid weakness with sudden onset of pain and profound weakness, has dramatically improved since last being seen." (Id.) Dr. Chapman recommended an exercise strengthening program. (Id.)

Plaintiff had a radiograph of her left hip on January 5, 2001 at St. Mary's Duluth Clinic Health System. (Tr. 191). The results were normal. (Id.) On June 6, 2001, Plaintiff was treated for acute sinusitis. (Tr. 204.)

Plaintiff saw Physician Assistant ("PA") Craig Potter at West Family Practice on October 2, 2003, for nasal congestion and sinus pressure. (Tr. 202-03.) She denied fever, shortness of breath, chest pain and other symptoms. (Tr. 203.)

On May 20, 2004, Plaintiff complained of sinus and nasal congestion, chest congestion, wheezing, and cough. (Tr. 202.) Plaintiff denied a history of asthma but acknowledged smoking cigarettes. (Id.) Plaintiff also denied shortness breath. P.A. Potter diagnosed bronchitis and sinusitis. (Id.)

**D.      Medical Records After the Date Last Insured of December 31, 2004**

On April 8, 2005, Dr. Chapman evaluated Plaintiff for sinus drainage, which she reported was chronic. (Tr. 201.) Upon examination, Plaintiff's blood pressure was elevated, and she weighed 262 pounds. (Id.) Plaintiff denied chest pain, shortness of breath, wheezing and coughing. (Id.) Plaintiff's examination was normal. (Id.) Dr. Chapman diagnosed URI with associated sinus drainage, hypertension, gross obesity, and smoking addiction. (Id.)

7

Plaintiff followed up with Dr. Chapman for evaluation of hypertension on April 25, 2005. (Tr. 200.)  On examination, Plaintiff denied abdominal pain, back pain, chest pain, edema, palpitations, tachycardia, and vision changes.  (Id.)  Plaintiff's blood pressure was not adequately controlled, and Dr. Chapman prescribed Lisinopril.  (Id.)

Plaintiff saw Dr. Chapman again on May 6, 2005, because she had sharp, stabbing abdominal pain.  (Tr. 199.)  At the time she saw Dr. Chapman, the pain had improved overnight. (Id.)  On examination, Dr. Chapman noted that Plaintiff was very obese, and had "two plus expiratory wheezing" when lying down.  (Id.)  Dr. Chapman diagnosed upper bowel pain of undetermined etiology.  (Id.)  He ordered an ultrasound to rule out acute cholecystitis.[10]  (Id.)

On June 6, 2005, Plaintiff saw Dr. Chapman for evaluation of elevated blood pressure. (Tr. 197).  Plaintiff had been treating with diet, exercise, and Lisinopril, but the Lisinopril was discontinued when it caused severe abdominal pain.  (Id.)  Dr. Chapman also noted that Plaintiff had continued COPD due to tobacco abuse.  (Id.)  He also felt that Plaintiff had all of the symptoms of sleep apnea, including obesity, small oral pharynx, loud snoring, waking up frequently, and constantly tired.  (Id.)  In a review of systems, Plaintiff reported fever, night sweats, fatigue, general weakness, cough, and intermittent joint pain.  (Id.)  Dr. Chapman diagnosed essential hypertension, COPD, sleep apnea and mild postnasal drainage.  (Tr. 198.) He ordered a sleep study, and recommended diet, exercise, and smoking cessation.  (Id.)

On June 30, 2005, Dr. Susanne Pearce at Lake Superior Internal Medicine described Plaintiff as a 54-year-old woman who had not sought regular medical care and now wanted a complete physical examination.  (Tr. 224-26.)  Plaintiff had a long and heavy smoking history

---

[10]     Cholecystitis is inflammation of the gallbladder.  Dorland's 354.

but was down to 1 ½ packs a day.  (Tr. 224.)  Plaintiff reported severe dyspnea, and she could only walk less than a block.  (Tr. 226.)  She could climb a flight of stairs, but it took her time to recover.  (Id.)

On examination, Plaintiff had no wheezing or rales in the lungs and had a very prolonged expiratory phase.  (Id.)  Examination was normal.  (Id.)  Plaintiff had hypertension that was not well-controlled.  (Id.)

Plaintiff was having pain when taking a deep breath, and she saw Dr. Pearce for evaluation on July 14, 2005.  (Tr. 222.)  Dr. Pearce noted Plaintiff was very inactive due to COPD, and she had increased cough from her baseline smoker's cough.  (Id.)  Plaintiff also had pain in the right shoulder with movement.  (Id.)  She continued to have hypertension despite treatment.  (Id.)  On examination, there was diffuse wheezing in the lower half lung fields.  (Id.)  Dr. Pearce assessed COPD with reactive airways and decreased peak flow at 200cc.  (Id.)  She recommended aggressive treatment with albuteral and Flovent, and she ordered an x-ray of Plaintiff's right shoulder.  (Id.)  A week later, the x-ray showed minimal degenerative change about the AC joint but was otherwise normal.  (Tr. 220.)  Dr. Pearce also noted Plaintiff had an appointment for an ultrasound for a  right carotid bruit.[11]  (Tr. 222.)

Plaintiff then had a right lung biopsy on August 11, 2005, and the biopsy supported a diagnosis of "non-small cell carcinoma of pulmonary origin, favor adenocarcinoma."  (Tr. 252-53.)  Plaintiff followed up with Dr. Bachelder the next week.  (Tr. 281-82.)  In a review of systems, Plaintiff reported hot flashes, significant intermittent headaches, incontinence, back

---

[11]     Carotid pertains to the principal artery of the neck.  Dorland's 302.  Bruit is an abnormal blowing or swishing sound or murmur.  Mosby's 233.

pain, bilateral knee pain, hip pain, psoriasis, borderline diabetes, and ongoing intermittent anxiety and panic. (Tr. 282.) Dr. Bachelder recommended exercise but noted Plaintiff was not enthusiastic about it because of her back and knee pain. (Id.) A CT scan of Plaintiff's chest was negative for signs of a post-obstructive process. (Id.)

Plaintiff saw Dr. Mary Boylan at St. Luke's for surgical consultation on August 22, 2005. (Tr. 289-91.) Dr. Boylan noted that Plaintiff's pulmonary function tests on August 16 revealed FEV-1 of 1.48 and FVC[12] of 2.37, which improved significantly with bronchodilators. (Tr. 289, 356-58.) Dr. Boylan noted that Plaintiff said she was not working secondary to back problems, but Dr. Bachelder's note indicated she was not working secondary to respiratory problems. (Tr. 290.) Dr. Boylan also noted "[t]he patient is not very physically active due to her knees which are somewhat bothersome." (Id.) The next week, Plaintiff had an abnormal electrocardiogram. (Tr. 245.)

Plaintiff was referred to Dr. Andrew Roxby at St. Luke's Oncology & Hematology Associates, whom she saw on August 29 for cancer treatment planning. (Tr. 270-71.) Plaintiff reported chronic shoulder, back and hip pain, and no progressive shortness of breath. (Tr. 271.) Plaintiff's pulmonary function had improved, making her a good candidate for surgery. (Id.) She was suffering tobacco withdrawal including anxiety, for which she was prescribed Wellbutrin. (Id.)

Plaintiff was admitted to St. Luke's Hospital on September 1, 2005, for right lower lobectomy to treat lung cancer. (Tr. 234.) Upon surgery, there was no evidence of malignancy in the lymph nodes. (Tr. 239). Plaintiff was discharged six days later, and was given

---

[12]     FVC stands for forced vital capacity. Dorland's 763.

10

supplemental oxygen for home use.  (Tr. 234.)  Her additional diagnoses on discharge included

COPD, hypertension, degenerative joint disease, chronic low back pain, bilateral rotator cuff

disease and anxiety.  (Id.)

      Two weeks after surgery, Plaintiff had shortness of breath upon exertion, and she was

using oxygen at home.  (Tr. 279.)  She also had painful coughing, and anxiety.  (Id.)  Plaintiff

was given a several prescriptions to treat her cough and COPD.  (Id.) Testing in the clinic

showed her oxygen levels were good, even with exercise.  (Tr. 279-80. )

      In early October, Plaintiff had pain and anxiety, which Dr. Bachelder felt was secondary

to chemotherapy.  (Tr. 277-78.)  Dr. Bachelder also ordered an overnight polysomnogram,

because Plaintiff was fatigued and she had an abnormal overnight oximetry.  (Tr. 278.)

      On October 10, 2005, Dr. Pearce noted that Plaintiff completed one cycle of

chemotherapy after her right lower lobectomy.  (Tr. 218.)  Plaintiff suffered thrush as a side

effect, but it responded to treatment.  (Id.)  Plaintiff had cold type symptoms but was able to "do

her activity" without oxygen during the day.  (Id.)  Plaintiff had resumed smoking less than a

half pack a day.  (Id.)

      Plaintiff saw Dr. Pearce after several chemotherapy treatments, and complained of

increasing incisional pain.  (Tr. 216.)  She also had a cough and was using oxygen at night and

occasionally during the day for shortness of breath.  (Id.)  Plaintiff had no pain on examination.

(Id.)  Dr. Pearce noted Plaintiff was tolerating chemotherapy fairly well but was losing her hair.

(Id.)

      On November 1, 2005, Plaintiff saw Dr. Susanne Pearce for coughing, chest pain and

dyspnea.  (Tr. 215.)  Upon examination, Plaintiff was in mild respiratory distress with shallow

breathing.  (<u>Id.</u>)  Plaintiff had abnormal lung sounds and a chest x-ray was ordered.  (<u>Id.</u>)  There were no acute findings on x-ray.  (Tr. 232.)

A week later, Plaintiff had an outpatient oncology visit at St. Luke's Oncology & Hematology Associates with Dr. Lorre Ochs.  (Tr. 264-65.)  Plaintiff was on her third cycle of chemotherapy and was tolerating it fairly well.  (Tr. 264.)  She had no pain complaints aside from when she coughed hard.  (<u>Id.</u>)  She had some intermittent peripheral neuropathy but said it was tolerable, although it sometimes made it difficult for her to hand quilt.  (<u>Id.</u>)

On November 10, 2005, Dr. Bachelder noted that Plaintiff's sleep study was significant for moderate obstructive sleep apnea.  (Tr. 274.)  Plaintiff was prescribed a CPAP.  (<u>Id.</u>)

At the end of November, Plaintiff did not want to do her final cycle of chemotherapy because she felt exhausted and found it difficult to do things around the house.  (Tr. 260.)  She was also suffering fatigue and depression.  (<u>Id.</u>)  Dr. Ochs advised Plaintiff that another cycle of chemotherapy would not improve her prognosis, so it was reasonable for her to decline.  (Tr. 261.)

Plaintiff had a CT scan of the chest on December 12, 2005.  (Tr. 231.)  There was no evidence of a recurrent nodule after her partial lobectomy of the right lung.  (<u>Id.</u>)  She also had a CT scan of the abdomen, which was negative.  (<u>Id.</u>)

Plaintiff followed up with Dr. Ochs on December 19, 2005.  (Tr. 258-59.)  She had no further nausea or vomiting six or seven weeks after completion of chemotherapy, and her energy level was consistently improving.  (<u>Id.</u>)  She was able to quilt and do other activities with her hands, which were improving, and she had no difficulty walking.  (<u>Id.</u>)  Her examination was normal.  (<u>Id.</u>)

Plaintiff saw Dr. Bachelder at St. Luke's Pulmonary Medicine again on December 21, 2005.  (Tr. 272-73.)  Plaintiff reported that she was breathing fairly well but had a decreased exercise tolerance due to back and other musculoskeletal problems.  (Tr. 272.)  She could not tolerate her CPAP, so Dr. Bachelder recommended that she use oxygen at night.  (Id.)  Follow up CT scans of Plaintiff's chest and abdomen in March and June 2006 were negative.  (Tr. 344-45.)

When Plaintiff had repeat CT scans on September 21, 2006, the chest scan indicated a "new nodular appearing 'infiltrate' in the right lower lung field" and un-united right rib fracture.  (Tr. 342.)  In follow up the next month, a CT scan of Plaintiff's chest indicated clear lungs and several rib fractures on the right side, one of which was healed and two that were not.  (Tr. 341.)

In December 2006, Plaintiff saw Dr. Bachelder and complained of shortness of breath and difficulty walking.  (Tr. 306.)  Plaintiff reported she was exercising using her arms by cleaning windows and folding laundry.  (Id.)  Dr. Bachelder offered formal physical therapy, but Plaintiff declined.  (Id.)  Dr. Bachelder also noted that Plaintiff did not wish to treat her sleep apnea despite his vigorous attempts to get her use to her CPAP.  (Id.)  On December 11, 2006, a radiology report indicated Plaintiff's heart could be slightly enlarged and her lungs were hyperinflated.  (Tr. 338.)  It also indicated a new right chest wall deformity with either old rib fractures or thoracotomy.  (Id.)

Plaintiff was admitted to St. Luke's emergency room on January 13, 2007, with complaints of left-sided flank pain.  (Tr. 335.)  The pain was severe with coughing, deep breath, and various movements.  (Id.)  Plaintiff was given morphine for pain, and a CT scan was ordered.  (Tr. 336.)  A chest x-ray indicated multiple old right-sided rib fractures.  (Tr. 337.)

Plaintiff saw Dr. Ochs that day and complained of dull persistent pain in the left rib cage area, and severe chest pain with deep breathing, coughing, sneezing or certain activities.  (Tr. 326-28.)  Plaintiff's CT scans of the abdomen and pelvis were unremarkable.  (Tr. 328.)  Dr. Ochs ordered a bone scan but doubted cancer was the cause of her pain.  (Id.)  The bone scan indicated abnormally increased uptake in the right 8th or 9th rib, and x-rays were recommended.  (Tr. 329.)  The x-rays, performed on January 16, 2007, indicated that the uptake on the bone scan likely represented unhealed fractures of the 7th and 8th right ribs.  (Tr. 331.)

The next day, Plaintiff was admitted to St. Luke's Hospital, with complaints of stabbing pain in the left lower rib area.  (Tr. 317-19.)  Plaintiff reported severe shortness of breath.  (Tr. 318.)  She could only walk one block slowly, and she had to take time to recover from climbing a flight of stairs.  (Id.)  Plaintiff was referred for a pulmonary consultation with Dr. Bachelder the next day.  (Tr. 320-22.)  Dr. Bachelder treated Plaintiff with Prednisone and ordered a number of tests.  (Tr. 322.)  Dr. Mark Monte examined Plaintiff and reviewed her CT scans of the abdomen and pelvis.  (Tr. 323-25, 333.)  He opined that Plaintiff's pain was likely from muscular strain or tear or nondisplaced rib fracture.  (Tr. 324.)  A CT scan of the chest on January 15, 2007, indicated nodular pleural thickening in the right hemithorax and multiple right rib fractures in various stages of healing.  (Tr. 332.)

Plaintiff was overall stable when she followed up in Oncology on February 22, 2007.  (Tr. 299.)  Plaintiff was slowing tapering from pain medication.  (Id.)  She complained of chronic dyspnea and chronic knee and hip pain.  (Id.)  The next month, Plaintiff was having some financial problems with paying for her prescription medications, but her breathing was "fairly good."  (Tr. 304-05.)

On March 15, 2007, a CT scan of Plaintiff's chest showed bilateral partially healed rib fractures and irregular pleural thickening, mostly on the right side and stable since the last scan. (Tr. 312.)  An x-ray of Plaintiff's ribs on May 30, 2007 also indicated fractures.  (Tr. 311.)  And when Plaintiff had another scan on June 8, 2007, it indicated un-united rib fractures bilaterally and irregular pleural thickening.  (Tr. 297.)  There was no evidence of recurrent lung nodule or lymphadenopathy.  (Id.)

On June 10, 2007, Plaintiff followed up with Dr. Bachelder for COPD, cough and rib fractures.  (Tr. 302-03.)  On examination, Plaintiff had decreased breath sounds bilaterally.  (Tr. 302.)  Dr. Bachelder stated:

> [s]he seems to be doing fairly well, with the exception of her cough which has worsened since she has gone back to smoking. . . . [She] is making a request for portable oxygen and, although she does not meet criteria at rest, she certainly may meet criteria during exercise.  She already has an order for this and, therefore, she will go forward with using portable oxygen during exertion."
> (Tr. 303.)

Plaintiff followed up at St. Luke's Oncology on June 28, 2007.  (Tr. 293.)  Plaintiff's review of systems was positive for blurred vision, tremors, numbness and tingling in the extremities, excessive thirst, too hot or too cold, tired and sluggish, chest pain from rib fractures, hypertension, psoriasis, joint and back pain, cough, wheezing and shortness of breath.  (Tr. 293-94.)  Plaintiff continued to use nasal oxygen at night.  (Tr. 293.)

On September 25, 2007, Dr. Bachelder completed a form regarding Plaintiff entitled "Physical Restrictions- FROM 12/31/2004 ONWARD."  (Tr. 346.)  Dr. Bachelder indicated that Plaintiff could tolerate sitting up to six hours in an eight-hour workday; stand or walk up to two hours; occasionally lift up to ten pounds; never lift twenty pounds or more; never climb, balance,

stoop or crouch; bend up to one third of the workday; sustained or repetitive neck movement up to two thirds of the workday.  (Id.)  He also opined that Plaintiff could not sustain work activity for eight hours a day, five days a week.  (Id.)  Dr. Bachelder explained this by stating, "Pt with severe asthma which has limited her although she continues to smoke."  (Id.)

Dr. Bachelder also completed a checklist of pulmonary restrictions.  (Tr. 347.)  He stated that Plaintiff should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation and avoid concentrated exposure to extreme cold and heat, wetness and humidity. (Id.)

Also on September 25, Dr. Bachelder wrote a "To Whom it May Concern" letter regarding his treatment of Plaintiff and his opinion of her functional limitations.  (Tr. 354-55.) He stated in his letter:

> [Plaintiff] is a 54-year-old woman who has a history of COPD who probably also has a significant component of asthma in that she does have significant improvement with bronchodilators when evaluating her pulmonary function testing.  She did have a preoperative pulmonary function test in 08/2005 which showed an FEV1 of 1.48 which was 63% of predicted and FVC of 2.37 which is 83% of predicated for an FEV1/FVC ratio of 62.  She had significant wheezing improvement in FVC with bronchodilators and on physical exam she commonly has significant wheezing. However, since these pulmonary function tests the patient has undergone a right lower lobectomy with lymph node dissection for nonsmall cell carcinoma of the lung.  This suggests that should she have repeat pulmonary function testing she most likely would have significant decrements as compared to her most recent pulmonary function testing.  Barbara has also sustained rib fractures on the left which seemed to be somewhat spontaneous in nature and thought to be possibly secondary to coughing.  This has also limited her ability to perform physically.  She has also had several asthma exacerbations and respiratory tract infections over the last few years.  All of these things do contribute to a limitation in Ms. Wallace's ability to perform work.  I believe that she has been significantly limited since 12/31/2004 that they have been fairly

16

> continuous given the patient's resection for lung cancer as well as intermittent asthma exacerbations and respiratory infections. At present I do believe that Ms. Wallace could tolerate sitting for up to six hours and probably walking or standing for possibly up to two hours. I do not believe that given her pulmonary limitations that heavy lifting should be attempted ever, although she could probably lift less than 10 pounds up to one third of a work day. Given her pulmonary limitations I would probably also avoid entirely climbing or balancing or stooping or crouching and do only a limited amount of bending, perhaps up to one third of the work day. I first saw Ms. Wallace in 08/2005 but given her history and what she has described I do believe that her disability probably does date from 12/31/2004 onward.

(Tr. 354.) Dr. Bachelder's letter went on to state that Plaintiff continued to smoke, which would make asthma and COPD worse. (Id.) He indicated that if she quit smoking, it was possible that she could recover enough pulmonary function to work in a limited fashion. (Id.) He stated that a new pulmonary function test, especially once she quit smoking, would give a better idea. (Id.)

### E.      Administrative Hearing

Plaintiff and her husband testified at the hearing before the ALJ on October 23, 2007. Plaintiff testified that she lived with her husband, who worked full-time. (Tr. 29.) Plaintiff did not have any income from full-time work since her alleged onset date. (Id.) In the summer of 2000 or 2001, Plaintiff worked part-time for approximately three weeks. (Tr. 30.)

Plaintiff testified that she rarely drove because she had difficulty with breathing. (Tr. 31.) She continued to smoke despite medical advice that she quit, but she had been unable to quit. (Tr. 32.) Plaintiff said she only walked if she had something to hold onto. (Tr. 33.) Plaintiff testified that three years prior, she could stand for about a half hour at one time before resting, but could stand for less and less time as the day went on. (Tr. 51.)

Plaintiff also testified that at present, she used oxygen all of the time, whereas she used to use it off and on during the day and always at night.  (Tr. 34.)  Plaintiff was using a CPAP machine, after she found one that she could tolerate.  (Tr. 34-35.)

The ALJ asked Plaintiff about limitations in her right arm that occurred after she had cancer in her arm and surgery in 1993.  (Tr. 36-37.)  Plaintiff said she could use her right arm over her head but her COPD made it difficult.  (Tr. 37.)  When she put any stress on her right arm, it went into a spasm.  (Tr. 47.)  She could not write, sew, knit or crochet for any length of time because her arm muscles went into spasm.  (Tr. 47-48.)  She could only use her right arm for one to five minutes.  (Tr. 48.)  Fine finger work caused her arm to spasm.  (Id.)  She was able to use a sewing machine because it involved using a foot pedal and did not require fine motor skill.  (Tr. 49.)  Plaintiff's right arm also went into a spasm if she lifted any weight with it.  (Tr. 50.)

The ALJ asked Plaintiff when she first had symptoms of lung cancer.  (Tr. 38.)  Plaintiff testified that she did not know she had lung cancer until she had a physical exam after changing doctors.  (Id.)  Plaintiff also testified that her rib fractures had not healed since 2006 because her ribs fracture when she coughs severely.  (Tr. 38-39.)  Plaintiff did not know if she had been diagnosed with osteoporosis.  (Tr. 39.)

Plaintiff had back pain, but no doctor ever recommended surgery.  (Tr. 40.)  Plaintiff also had knee pain, but surgery was not recommended.  (Id.)  Plaintiff had upper respiratory infections three or four times a year, which she treated with antibiotics.  (Tr. 41-42.)  Plaintiff also had anxiety problems, and medications helped, but she still had anxiety.  (Tr. 42.)

18

Plaintiff could bathe herself, but she relied on her husband for many things, including things that required climbing stairs.  (Tr. 43.)  Their son also helped when he lived with them. (Id.)  Plaintiff did what she could around the house, but she had difficulty because she couldn't always climb back up a flight of stairs once she has gone down, because she was short of breath. (Tr. 44.)  Her shortness of breath had gotten worse progressively.  (Tr. 45.)  When Plaintiff's benefits terminated in 2000, she had difficulty walking due to back and knee pain.  (Tr. 45-46.) She also had shortness of breath, which was worse at the time of the hearing.  (Tr. 46.)

Plaintiff's husband, Stephen Wallace, testified that Plaintiff could take care of herself while he was at work.  (Tr. 53.)  She could do some cooking, usually once a day, but could not do laundry because it was in the basement and required climbing stairs.  (Tr. 53-54.)  Before she had lung cancer, Plaintiff could shop by herself.  (Id.)  Plaintiff could still drive for short trips, such as to a grocery store that was one and a half miles away.  (Id.)  She did not drive more than an hour.  (Tr. 55.)

Plaintiff and her husband used to spend time on the weekends with their six grandchildren, but the visits had dwindled to an afternoon visit because Plaintiff did not have enough energy.  (Tr. 56.)  It had been at least four years since Plaintiff cared for their grandchildren overnight.  (Tr. 57.)

Plaintiff and her husband could no longer take trips.  (Tr. 57-58.)  Between the years 2000 and 2004, Plaintiff and her husband did not go to antique stores as much as they used to because Plaintiff had difficulty being comfortable in the car.  (Id.)  They used to go fishing, but they could now only fish from the shore, and had not even bought fishing licenses for the last

two years.  (Tr. 56, 58-59.)  Plaintiff could no longer walk down the stairs into the basement, and this had been true for at least a couple of years.  (Tr. 56, 58-59.)

Mr. Stephen Bosch testified at the hearing as a vocational expert.  (Tr. 59-64.)  He testified that Plaintiff's past work as a nurse's aid was not more than fifteen years prior to her alleged onset date.  (Tr. 60.)  The ALJ then asked Mr. Bosch a hypothetical question regarding the employability of a person with Plaintiff's age, education and work experience, who had the following limitations from her impairments: lifting up to twenty pounds occasionally, ten pounds frequently; right upper extremity activities on an occasional basis; occasional climbing, kneeling, crouching and crawling; and no exposure to high concentrations of air pollutants.  (Tr. 60-61.)  The VE testified that such a person could not perform Plaintiff's past relevant work but could perform other work such as office helper, with a DOT[13] code of 239.657-010, and with 5,000 such jobs in Minnesota; childcare center worker, with a DOT code of 359.677-018, and with 15,000 such jobs in Minnesota; and product assembler, with a DOT code of 706.687-010, and with 20,000 such jobs in Minnesota.  (Tr. 62.)

The ALJ posed a second hypothetical question, adding a restriction of requiring a sit/stand option from the standing position every twenty minutes.  (Id.)  The VE testified that the further restriction would eliminate the product assembly jobs but would not appreciably affect the office helper or childcare jobs.  (Id.)  When the ALJ added restrictions of no unprotected heights or hazardous machinery, the VE testified it would not affect the office helper or childcare jobs.  (Tr. 62-63.)

---

[13]     The Dictionary of Occupational Titles or "DOT" is "a Labor Department guide to job ability levels which has been approved for use in Social Security disability cases."  Smith v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995).

The ALJ asked another hypothetical question where the person could only use her right arm as an assist on a frequent basis but could not do repetitive or constant fine manipulation tasks.  (Tr. 63.)  The VE testified that such a person could not perform the childcare or office helper jobs, and there would be no other jobs such a person could perform.  (Id.)  The VE confirmed that his testimony was consistent with the DOT.  (Id.)

The ALJ then posed another hypothetical question concerning a person who could lift less than ten pounds up to one third of the day, no heavy lifting; standing and walking up to two hours a day; and sitting up to six hours a day.  (Tr. 63.)  The VE testified that there are jobs at the sedentary level such a person could perform including information clerk, DOT code 237.367-022, with 5,000 such jobs available and security monitor, DOT code 379.367-010 with 1,000 such jobs.  (Tr. 64.)

## F.    ALJ's Decision

In dismissing Plaintiff's claims for disability benefits, the ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2004.
>
> 2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2000 through her date last insured of December 31, 2004 (20 CFR 404.1520(b) and 404.1571 *et seq.*).
>
> 3.  Through the date last insured, the claimant had the following severe impairments: chronic obstructive pulmonary disease (COPD) secondary to tobacco abuse, obesity, history of right arm carcinoma status post removal of the brachial muscle, and degenerative changes in the cervical spine.  (20 CFR 404.1520©).
> . . .
> 4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (20 CFR 404.1520(d), 404.1525 and 404.1526).
. . .
5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work involving lifting 20 pounds occasionally and 10 pounds frequently, sitting two hours and standing/walking six hours in an eight-hour workday, with only occasional reaching overhead with the right upper extremity, only occasional climbing, kneeling, crouching and crawling, and no work around high concentrations of air pollutants such as dust, fumes and gases.
. . .
6.  The claimant is unable to perform past relevant work  (20 CFR 404.1565).
. . .
7.  The claimant was born on November 26, 1950, and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured  (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work  (20 CFR 404.1568).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.  (20 CFR 404.1560© and 404.1566).
. . .
11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2000, the alleged onset date, through December 31, 2004, the date last insured (20 CFR 404.1520(g)).

(Tr. 12-18).

## III.   CONCLUSIONS OF LAW

### A.    Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  In making a disability determination, the ALJ must follow a sequential evaluation process which applies to both physical and mental disorders.  20 C.F.R. § 404.1520 outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled.  The disability determination requires a step by step analysis.  See 20 C.F.R. § 404.1520(a).  At the first step, the ALJ must consider the claimant's work history.  At the second step, the ALJ must consider the medical severity of the claimant's impairments.  At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or medically equal one of the listings in Appendix 1 to Subpart P of the regulations.  If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's residual functional capacity and the claimant's ability to perform her past relevant work.  If the claimant can perform her past relevant work, the ALJ will find that she is not disabled.  If the claimant can not perform her past relevant work, the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy."  Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000.)

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's

conclusion." Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision. Moore ex rel Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

Plaintiff makes two arguments in support of her motion for summary judgment. First, she contends the ALJ should have granted her treating physician's opinion greater weight. Second, she contends the ALJ should have followed the decision of an earlier ALJ, who granted Plaintiff disability because part of her right arm muscle was removed. Plaintiff also asserts that the reason she sought little treatment during the relevant Time frame was that she controlled her impairments by leading a sedentary lifestyle.

## B.     Substantial Evidence Supports the ALJ's Decision To Grant Little Weight To Dr. Bachelder's Opinion

A treating physician's opinion is typically entitled to controlling weight if it is "'well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). A non-treating physician's assessment, when the physician has not examined the claimant, normally

does not constitute substantial evidence on the record as a whole.  <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1017 (8th Cir. 2010).  However, there are circumstances "in which relying on a non-treating physician's opinion is proper."  <u>Id.</u>

Plaintiff asserts that although Dr. Bachelder did not treat her until after her date last insured, he had evidence of her medical history upon which to base his opinion.  Plaintiff further asserts that Dr. Bachelder's opinion was supported by contemporaneous evidence.

Plaintiff cites Social Security Ruling 83-10 for the proposition that where the onset of disability must be inferred, the ALJ should call on a medical expert to provide a legitimate basis for the onset date.  Plaintiff contends Dr. Bachelder's opinion provided the onset date of December 31, 2004.

Plaintiff contends the ALJ had no basis to determine that the August 2005 pulmonary function test was inconsistent with Dr. Bachelder's opinion.  Plaintiff also contends that Dr. Johnson's report in 1999 does not provide a basis for rejecting Dr. Bachelder's opinion because Dr. Johnson's report was five years prior to the date last insured, and Dr. Johnson was not a lung specialist.

Defendant responds that Dr. Bachelder did not begin treating Plaintiff until 2005 and did not render his RFC opinion until three years after Plaintiff's insured status expired.  Defendant also notes that consultative and examining physicians' opinions contradicted Dr. Bachelder's opinion.  Specifically, Defendant points out that soon before the relevant time period, Dr. Johnson noted there was dramatic improvement in Plaintiff's condition since her original disability exam.  Defendant argues that the prior SSA decision, terminating Plaintiff's disability benefits for medical improvement, applies through March 2000.  Plaintiff's alleged onset date

here is August 1, 2000 and her date last insured is December 31, 2004.  Defendant asserts that

Plaintiff had very little medical treatment between August 2000 and December 31, 2004.  In fact,

the state agency reviewing physicians found no severe impairments in this Time frame.

In weighing the medical opinions, the ALJ noted that if he accepted Dr. Bachelder's

restriction of Plaintiff to sedentary activities, it would result in a finding that Plaintiff was

disabled under the medical vocational rules.  (Tr. 15.)  The ALJ, however, stated that after he

carefully considered Dr. Bachelder's September 2007 letter, he concluded that his opinion was

entitled to little weight.  (Id.)  In support of this conclusion, the ALJ gave the following reasons.

First, Dr. Bachelder did not examine or treat Plaintiff until August 2005; therefore, he had no

direct knowledge of her work capacity since December 31, 2004, other than from Plaintiff's own

descriptions.  (Id.)

Second, the ALJ noted the objective record prior to the date last insured was "minimal at

best, and reveals virtually no specific treatment for COPD despite the claimant's allegations of

severe breathing problems."  (Id.)  The ALJ concluded that neither Plaintiff's allegations nor Dr.

Bachelder's opinion were supported by the evidence.  (Id.)  Third, the ALJ noted that Plaintiff's

pulmonary function test results in August 2005, just prior to lung surgery, were consistent with

only moderate obstruction, which was not consistent with Dr. Bachelder's opinion.  (Id.)  Lastly,

the ALJ noted that Plaintiff and her husband testified that her shortness of breath had gotten

progressively worse to the extent that in 2007, she was on home oxygen.  (Id.)  The ALJ

reasoned that if she could perform sedentary work in 2007 despite requiring oxygen, it was

reasonable to assume she was capable of greater activity in the years 2000-2004, when she was

not on oxygen or any other treatment.  (Id.)

As a preliminary issue, evidence prior to the alleged disability onset date may be relevant if there is no valid reason to exclude consideration of the evidence.  <u>Vandenboom</u>, 421 F.3d at 750.  Similarly, "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status" may be considered "because it may bear upon the severity of the claimant's conditions before the expiration of his or her insured status."  <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984); <u>but</u> <u>see</u> <u>Davidson v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007) (comparing <u>Basinger</u> with <u>Rehdr v. Apfel</u>, 205 F.3d 1056, 1061 (8th Cir. 2000), where the Eighth Circuit found that a report dated fourteen months after the relevant time period was not probative of the plaintiff's condition during the period of insured status.)  When the ALJ determines the onset date of disability, the ALJ should consider the claimant's alleged onset date, the claimant's work history, and the medical and other evidence of the claimant's condition.  <u>Karlix v. Barnhart</u>, 457 F.3d 742, 747 (8th Cir. 2006).  "If the medical evidence regarding onset is ambiguous, however, the ALJ should obtain an expert opinion from a medical advisor to determine a medically reasonable date of onset."  <u>Id.</u> (citing <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1200-01 (8th Cir. 1997); <u>see</u> <u>also</u> Social Security Ruling 83-20 [1983 WL 31249 (S.S.A.)]).

The starting point here is Plaintiff's alleged onset date of August 1, 2000.  Plaintiff had not worked full-time since 1991.  In fact, she received social security disability benefits from August 1992 through the end of July 2000, at which time her benefits ceased because she had been found no longer disabled due to medical improvement.  Plaintiff did not appeal this decision, instead, she alleges she was disabled the day after her benefits ceased.  The court finds no evidence to support that contention.  However, Plaintiff's treating physician, Dr. Bachelder,

opined that Plaintiff became disabled by December 31, 2004, her date last insured. Although Dr. Bachelder did not begin seeing Plaintiff until August 2005, he surmises that Plaintiff "has been significantly limited since 12/31/2004 [because her symptoms] have been fairly continuous given the patient's resection for lung cancer as well as intermittent asthma exacerbations and respiratory infections." (Tr. 354.)

Given that Plaintiff was not disabled in July 2000 due to medical improvement, and she was diagnosed with lung cancer in August 2005, the Court must determine whether the evidence is consistent with Dr. Bachelder's opinion that Plaintiff's condition had deteriorated such that she became disabled on December 31, 2004, her date last insured. Of course, the most relevant evidence is of Plaintiff's condition from August 1, 2000 through December 31, 2004.

There is no evidence during the relevant time period or subsequent to Plaintiff's date last insured that she would have greater restrictions using her right arm than those assessed by the ALJ. Plaintiff never complained of or sought any treatment for right arm pain nor is there any evidence of additional functional loss after it was determined that her arm had medically improved. Of course, Plaintiff is correct that she no longer had a brachial muscle in her right arm, but the evidence does not suggest that she had significant functional loss from this impairment. As far back as September 1992, Plaintiff had no pain in her right arm and was "fully active without limitations." (Tr. 568.) She displayed "excellent" motion and "excellent" strength. (Id.) A medical record from May 1993, ten months after Plaintiff's arm surgery, indicates that Plaintiff's chronic disability with the right arm was "associated with attempts at heavy lifting or prolonged use." (Tr. 559.)

When Plaintiff was evaluated for *left* arm weakness in October 2000, examination

28

revealed her biceps and deltoid function on the left were actually weak compared to the right arm, which is the arm without the brachial muscle. (Tr. 206-07.) Again, there was no mention of any functional loss of Plaintiff's right arm. (Id.) Thus, the Court rejects Plaintiff's argument that the ALJ should have continued her right arm restrictions from her prior period of disability.

Plaintiff also alleges her reduced pulmonary function and shortness of breath rendered her disabled during the relevant period, and the ALJ had no basis for finding that her August 2005 pulmonary function test results indicated only moderate reduction in her pulmonary function. There is no medical opinion in the record specifically interpreting the degree of functional loss that could be expected based on Plaintiff's August 2005 pulmonary function study. Dr. Bachelder did not specify that Plaintiff's pulmonary function test results alone indicated more than a moderate functional loss in breathing. Even if he had, his opinion would have been contradictory to that of Dr. Charles Grant, a state agency medical consultant, who reviewed Plaintiff's file on March 29, 2006, and denied Plaintiff's disability claim on reconsideration. (Tr. 70-71.) Among other things, Dr. Grant stated, "[y]our breathing ability was not severely reduced." (Tr. 71.)

Additionally, in finding that the August 2005 pulmonary test indicated only moderate functional loss, the ALJ could have compared Plaintiff's test results to the severity required to meet or equal a listing for respiratory systems. Under Listing 3.02(A), a person of Plaintiff's height is disabled without further analysis, if the person has COPD, due to any cause, and pulmonary function tests indicate an FEV-1 equal to or less than 1.15. See 20 C.F.R. 404, Subpt. P, Appendix 1, § 3.02(A). A person of Plaintiff's height would be disabled under Listing 3.02(B), chronic restrictive ventilatory disease, if pulmonary function testing indicated an FVC

equal to or less than 1.35.  See 20 C.F.R. 404, Subpt. P, Appendix 1, § 3.02(B).

In August 2005, Plaintiff's FEV-1 was 1.48 and her FVC was 2.37.  (Tr. 289, 356-58.)
Dr. Boylan also noted that these numbers improved significantly with bronchodilators.  (Tr.
289.)  For comparison, the Court notes that in February 2000, Plaintiff's FEV-1 ranged from 1.5
to 1.7 before and after bronchodilators.  Thus, Plaintiff's scores were considerably higher than
listing level, and her FEV-1 score deteriorated very little between February 2000 and August
2005, despite the fact that Plaintiff had lung cancer in August 2005.  Therefore, reference to the
regulations and review of the evidence in the record would have provided the ALJ sufficient
information to conclude that Plaintiff's FEV-1 and FVC scores represented no more than
moderate severity.  The Court recognizes that failure to meet or equal a listing does not imply
that Plaintiff was not disabled during the relevant time period.  Other evidence concerning her
respiratory symptoms must be considered.

In support of his opinion of Plaintiff's disability as of December 31, 2004, Dr. Bachelder
opined that Plaintiff's symptoms had been fairly continuous considering her lung cancer and
"intermittent asthma exacerbations" and "respiratory infections."  The Court agrees that Plaintiff
had continuous respiratory symptoms, but the issue remains whether the record supports the
opinion that her symptoms were of such frequency and severity that she could not perform light
work as described by the ALJ in his RFC determination.  Here, the frequency and severity of
Plaintiff's shortness of breath, asthma exacerbations and respiratory infections during the
relevant time frame is key to whether Dr. Bachelder's opinion is supported by the record.

Plaintiff was treated for sinusitis in October 2000, but she did not complain of cough or
shortness of breath.  (Tr. 207-08.)  Plaintiff was treated for sinusitis again in June 2001, but her

symptoms were primarily sinus pressure, nasal drainage and sore throat, with only a slight

cough. (Tr. 204.)   Plaintiff was next treated for nasal congestion and sinus pressure in October

2003. (Tr. 202-03).   At that time, she denied shortness of breath, chest pain and other symptoms.

(Tr. 202.)   In May 2004, Plaintiff was treated for bronchitis and sinusitis.  (Id.)   Although

Plaintiff had a cough, she denied shortness of breath.  (Id.)   She also denied a history of asthma

but acknowledged smoking cigarettes.  (Id.)   This is the totality of Plaintiff's treatment for

respiratory related illness during the relevant time frame.   Plaintiff never complained of or

sought treatment for shortness of breath, and her treatment for respiratory illness was no

different from what an average person might suffer, annual sinusitis with one episode of

bronchitis in four years.   See Bailey v. Amsted Industries Inc., 172 F.3d 1041, 1043 (8th Cir.

1999) (characterizing bronchitis, sinusitis and viral infection as common illnesses).   The Court

finds that the evidence from the relevant time period does not support Dr. Bachelder's opinion

that Plaintiff had such severe or frequent respiratory symptoms as to conclude that she could

perform only limited sedentary work before she was diagnosed and treated for lung cancer

beginning in August 2005.   Under these circumstances, the ALJ was not required to grant

significant weight to Dr. Bachelder's opinion.   The Court further notes that Dr. Bachelder did

not place any restrictions on Plaintiff for back or knee pain or functional loss in her right arm.

In determining Plaintiff's residual functional capacity, the ALJ was also required to

determine whether Plaintiff's subjective complaints regarding her symptoms were credible.  The

Court will review the ALJ's credibility determination below.

### C.      Evaluating the ALJ's RFC Determination

A claimant's RFC is what he or she can do despite his or her limitations.  20 C.F.R. §
404.1545.  The ALJ must determine a claimant's RFC by considering the combination of the
claimant's mental and physical impairments.  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.
2003). However, it is the claimant's burden, not the Commissioner's, to prove the RFC.  Pearsall v.
Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th
Cir. 1995)).

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including
medical records, observations of treating physicians and others, and the claimant's own descriptions
of his or her limitations.  Id.  The RFC determination must be supported by "medical evidence that
addresses claimant's ability to function in the workplace[.]"  Baldwin, 349 F.3d at 556 (quoting
Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).  However, the ALJ is not limited solely to
consideration of medical evidence, "but is required to consider at least some supporting evidence
from a professional."  Baldwin, 349 F.3d at 556 (citing 20 C.F.R.§ 404.1545©).

In considering a claimant's subjective complaints of disability, the ALJ must assess the
claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th
Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski
factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's
subjective complaints, including prior work record, and observations of third parties and treating and
examining physicians relating to such matters as:

> 1. the claimant's daily activities;
>
> 2. the duration, frequency, and intensity of the pain;

       3. precipitating and aggravating factors;

       4. dosage, effectiveness, and side effects of medication; and

       5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207.  The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of plaintiff's subjective complaints.  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

       "An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993.))  The failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).  Ultimately, the determination of a claimant's RFC, and the determination of whether a claimant is disabled are issues reserved to the Commissioner.  See Vossen v. Astrue, 612 F.3d 1011, 1015 (8th Cir. 2010).

       Plaintiff testified, and was corroborated by her husband, that she had the following limitations from her impairments.  She rarely drove because she had difficulty with breathing. (Tr. 31.)  She only walked if she had something to hold onto.  (Tr. 33.)  During the relevant time frame, she could stand for about a half hour at one time before resting, but could stand for less

and less time as the day went on.  (Tr. 51.)

Plaintiff said she could use her right arm over her head but her shortness of breath made it difficult.  (Tr. 37.)  When she put any stress on her right arm, it went into a spasm.  (Tr. 47.) She could only use her right arm for one to five minutes.  (Tr. 48.)  Additionally, Plaintiff had back pain, but no doctor ever recommended surgery.  (Tr. 40.)  Plaintiff also had knee pain, but surgery was not recommended.  (Id.)  When Plaintiff's benefits terminated in 2000, she had difficulty walking due to back and knee pain.  (Tr. 45-46.)

Plaintiff also testified she had upper respiratory infections three or four times a year, which she treated with antibiotics.  (Tr. 41-42.)  Her shortness of breath had gotten worse progressively.  (Tr. 45.)  Her shortness of breath prevented her from climbing up and down a flight of stairs.  (Tr. 43.)

In analyzing the credibility of Plaintiff's subjective complaints, the ALJ considered Plaintiff's testimony that she could not work because she suffered shortness of breath and pain in the right arm, back, knees and hip.  (Tr. 15.)  The ALJ noted that Plaintiff had to prove disability by December 31, 2004, but she was not diagnosed with lung cancer until August 2005, and she continued to smoke.  (Id.)  The ALJ concluded that the medical record for the years 2000-2004 did not support the limitations Plaintiff alleged from COPD or any other condition.  (Tr. 16.)

The ALJ cited the following objective evidence.  There was no evidence of work-related limitations from Plaintiff's sinusitis or elevated blood pressure.  (Id.)  Plaintiff had left upper extremity weakness in October 2000 but it resolved by December 2000, and the muscle strength in Plaintiff's arms was "impressive."  (Id.)  There was no evidence for significant treatment for COPD in the relevant time period.  (Id.)  When Plaintiff went to the clinic for a sinus infection in

May 2004, she had not been there in three years.  (Id.)  Plaintiff specifically reported no shortness of breath in May 2004 and April 2005.  (Id.)  Therefore, the ALJ concluded Plaintiff's ability to go without medical attention for a long period of time was inconsistent with a disabling physical impairment.  (Id.)  The ALJ characterized Plaintiff's treatment as treatment for "sudden onset of short-lived conditions."  (Id.)

The ALJ found that Plaintiff would have some limitations because she was morbidly obese, a heavy smoker, and she had surgical removal of a muscle in her right arm, with some degenerative changes of the cervical spine.  (Id.)  However, the ALJ found Plaintiff's daily activities in the relevant time frame to be inconsistent with Plaintiff's and her husband's testimony about her limitations.  (Id.)  The ALJ noted Plaintiff could do household chores, shop, cook, drive, watch her grandchildren overnight, go antiquing, travel and go fishing.  (Id.)  The ALJ found it credible that her ability to do these things declined over time, but did not find support in the record for the allegation that her ability to do these things significantly deteriorated by December 31, 2004.  (Id.)

In reviewing the ALJ's analysis of the physicians' opinion, the Court has concluded the evidence in the record, primarily the objective medical evidence, did not support Dr. Bachelder's RFC opinion.  The Court also concludes the objective medical evidence does not support Plaintiff's subjective complaints.  That is, of course, only one factor in assessing credibility.

The ALJ relied primarily on two Polaski factors in discounting Plaintiff's subjective complaints.  The first factor is lack of treatment for her alleged symptoms during the relevant time frame.  Plaintiff contends she did not seek treatment because she lived with her limitations by leading a sedentary lifestyle.  However, because Plaintiff never complained of arm, back or

knee pain or shortness of breath on the few occasions when she did seek medical treatment during the relevant time frame, the ALJ had reason to discount her explanation. "An ALJ may properly take into account that a claimant failed to make significant efforts to seek medical treatment." See Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006) (citing Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001)). Additionally, Plaintiff was repeatedly advised to quit smoking, and she did not, which is a negative credibility factor despite the fact that quitting smoking is a difficult thing to do. Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("an ALJ may properly consider the claimant's noncompliance with a treating physician's directions . . . including . . . quit smoking.")

The second factor the ALJ explicitly relied on was Plaintiff's daily activities. Just months before her alleged onset date of August 1, 2000, Plaintiff described her daily activities to Dr. Marcus Desmonde during a psychological consultative review in connection with the SSA's ultimate determination that she had medically improved after being granted benefits in 1992. Plaintiff said she "often" babysat and was "very active" because her three sons and four grandchildren lived nearby. (Supp. Tr. 795.) Plaintiff also engaged in her hobby of sewing when she had time. (Id.)

The relevant time period for Plaintiff's disability claim continued four years after Plaintiff's report to Dr. Desmonde, however; there is nothing in the record to suggest Plaintiff's impairments would have prevented her from continuing to engage in such activities. Plaintiff and her husband testified that her condition became progressively worse. In April 2005, Plaintiff denied shortness of breath. (Tr. 201.) In a cancer treatment planning consultation on August 29, 2005, Plaintiff reported no progressive shortness of breath on exertion. (Tr. 271.)

36

The record indicates that the decline in Plaintiff's condition occurred after her insured status expired, when part of her right lower lung was removed, and she had chemotherapy for lung cancer.  The record simply doesn't support a significant deterioration in Plaintiff's condition, particularly her shortness of breath, until after Plaintiff was treated for lung cancer.  Dr. Bachelder opined that Plaintiff's pulmonary functioning likely declined after part of her right lung was removed, but he also noted that it could improve if Plaintiff quit smoking.  (Tr. 354.)  "[A] nondisabling condition which later develops into a disabling condition after the expiration of the claimant's insured status cannot be the basis for an award of disability benefits under Title II."  Schulte v. Astrue, 694 F.Supp.2d 1030, 1037-38 (E.D. Mo. 2010) (quoting Stanfield v. Chater, 970 F.Supp. 1440, 1456 (E.D. Mo. 1997) (citations omitted).

Plaintiff also argued the ALJ erred because his RFC determination is not supported by a medical opinion.  Although the ALJ's RFC determination must be supported by medical evidence, the ALJ need not adopt a particular medical opinion as the RFC.  See Tuttle v. Barnhart, 130 Fed.Appx. 60, 62 (8th Cir. 2005) (affirming ALJ where he did not adopt RFC findings of reviewing physicians but incorporated parts of treating physicians' opinions and properly discounted claimant's subjective complaints) (per curiam) (unpublished).  The ALJ noted that the state agency medical consultants found that Plaintiff did not have any severe impairments during the relevant time frame.  (Tr. 16.)  However, the ALJ reviewed all of the evidence in the record and concluded that Plaintiff had some work restrictions from her impairments as of December 31, 2004.  (Tr. 15-17.)  The ALJ reasoned:

> [B]oth the claimant and her husband testified that the claimant's shortness of breath has gotten progressively worse over the years to the extent that by 2007 she is on home oxygen.  If the claimant is limited to performing sedentary work at the current time because

> of the progression of her lung disease despite requiring oxygen, it is reasonable to assume that she was capable of greater activity during the period from 2000-2004 when she was not on oxygen or any other treatment.

(Tr. 15.)  This was a reasonable conclusion.

As to Plaintiff's complaints of difficulty walking or using her right arm, she received no treatment or evaluation during the relevant time frame.  Even after her insured status expired and she was treated for lung cancer, in December 2005, Plaintiff reported no difficulty walking.  (Tr. 258-59.)  There is no evidence to corroborate Plaintiff's testimony that activity made her right arm spasm.  In December 2005, Plaintiff said she could quilt and do other activities with her hands.  (Tr. 258-59.)  A year later, Plaintiff said she was exercising her arms by cleaning windows and folding laundry.  (Tr. 306.)  Thus, for all the reasons discussed above, substantial evidence in the record supports the ALJ's decision that Plaintiff's impairments would allow the limited range of light work he assigned as Plaintiff's residual functional capacity during the relevant time period.  Therefore, the ALJ's decision should be affirmed.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.   Plaintiff's Motion for Summary Judgment (#11) **be DENIED**;

2.   Defendant's Motion for Summary Judgment (#18) **be GRANTED**;

3.   The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**


DATED: February 24, 2011

*s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 11, 2011**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.


This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.