**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

BARBARA WALLACE,

                                Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                Defendant.

Civil No. 10-342 (JRT/FLN)

**ORDER ADOPTING THE REPORT
AND RECOMMENDATION OF THE
MAGISTRATE JUDGE**

---

Lionel H. Peabody, **PEABODY LAW OFFICE**, P.O. Box 10, Duluth, MN 55801, for plaintiff.

Lonnie F. Bryan, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for defendant.

The Commissioner of Social Security denied plaintiff Barbara Wallace's application for disability insurance benefits under Title II of the Social Security Act. *See* 42 U.S.C. §§ 401-434. After exhausting her administrative remedies, Wallace sought judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). The case is before the Court on the parties' cross-motions for summary judgment. In a Report and Recommendation ("R&R") filed on February 24, 2011, United States Magistrate Judge Franklin L. Noel recommended affirming the Commissioner's decision. (R&R at 1, Docket No. 26.) Wallace filed timely objections to the R&R. (Docket No. 28.) This Court reviews the challenged portions of the R&R de novo under 28 U.S.C. § 636(b)(1)(C) and D. Minn. L.R. 72.2. Because substantial evidence supports the

23-381

conclusion that Wallace was not disabled within the meaning of the Social Security Act during the dates in question, the Court finds that the Commissioner did not err in denying Wallace's application for benefits.   Accordingly, the Court overrules Wallace's objections, adopts the R&R, and affirms the Commissioner's decision.

## BACKGROUND[1]

Wallace received disability insurance benefits from the Social Security Administration ("SSA") from August 1992 through July 2000.  (Admin. R. at 17, Docket No. 5.)  Wallace's date last insured for Title II benefits was December 31, 2004.[2]  (*Id.* at 17.)  Wallace filed a new application for disability insurance benefits on December 1, 2005 (*id.* at 102–06) alleging August 1, 2000 as the date she became newly disabled.  (*Id.* at 117.)

The SSA denied Wallace's application initially and upon reconsideration.  (*Id.* at 72–76, 80–82.)  On October 23, 2007, Wallace was granted a hearing before an administrative law judge ("ALJ").  (*Id.* at 19–67.)  The ALJ issued a decision denying Wallace's claim on the basis that she was not disabled within the meaning of the Social Security Act from August 1, 2000 through December 31, 2004.  (*Id.*)  Subsequently, the

---

[1] The facts are repeated only to the extent necessary to address Wallace's objections.  A more comprehensive statement of the relevant facts can be found in the R&R.  (Docket No. 26.)

[2] The "date last insured" is the date, based on a Wallace's earnings record, that she has acquired sufficient quarters of credit of coverage so as to be eligible for coverage, therefore, to be eligible for continuing coverage, Wallace must demonstrate she was disabled prior to this date. (Admin. R. at 10, Docket No. 5.)

SSA Appeals Council denied Wallace's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.*; 20 C.F.R. § 404.981.

The record shows that during the time period in question, August 1, 2000 through December 31, 2004, Wallace made several visits to physicians for an array of symptoms and conditions. On October 31, 2000, Wallace saw her physician, Dr. Chapman, at Duluth Clinic West Family Practice complaining of weakness of the left shoulder, but presenting no pain. (Admin. R. at 206–07, Docket No. 5.) Dr. Chapman recorded "questionable weakness of the biceps reflex" but "impressive" individual muscle strength of the arm and intact hand and wrist grip strength. (*Id.*) Wallace could only abduct her left arm to eighty degrees but could do so without limitation of motion or pain. (*Id.*) Wallace's x-ray results were normal. (*Id.*) Wallace relies on use of her left arm because the brachialis muscle of her right arm was surgically removed in August 1992 due to cancer-related compartment syndrome. (Suppl. Admin. R. at 515, 522, Docket No. 9.) In 1994, Dr. Chapman had written that Wallace's "activities are limited primarily to the left hand for upper extremity work. The right hand would be used as a helper . . . ." (*Id.* at 615.)

On December 7, 2000, Wallace went to St. Mary's Medical Center complaining of increased urination and flank pain. (Admin. R. at 192–96, Docket No. 5.) She was diagnosed with a urinary tract infection and pyelonephritis (*id.* at 192), which had resolved by her follow-up visit about three weeks later. (*Id.* at 205.) During her follow-up visit with Dr. Chapman, he noted that the left arm weakness Wallace previously

displayed had "dramatically improved since last seen" and any pain was "totally resolved." (*Id.*)

On October 2, 2003, Wallace was seen by Craig Potter, a physician's assistant at West Family Practice, for nasal congestion and sinus pressure. (*Id.* at 202–03.) She denied fever, shortness of breath, chest pain, or other symptoms. (*Id.* at 203.) Several months later, on May 20, 2004, Wallace saw Dr. Chapman again at West Family Practice with similar complaints of sinus and chest congestion, wheezing, and coughing. (*Id.* at 202.) Dr. Chapman noted that Wallace smoked cigarettes and diagnosed her with sinusitis and bronchitis. (*Id.*)

After 2004, Wallace continued to see Dr. Chapman through at least June 6, 2005. (*Id.* at 197.) On this date, Dr. Chapman noted elevated blood pressure and chronic obstructive pulmonary disease ("COPD") due to chronic tobacco use. (*Id.*) He diagnosed Wallace with essential hypertension, COPD, sleep apnea, and postnasal drainage. (*Id.* at 198.) Accordingly, he ordered a sleep study, and prescribed a diet, exercise, and smoking cessation. (*Id.*)

Dr. Bachelder, a pulmonary specialist, first saw Wallace in August 2005. (*Id.* at 281–82.) Wallace continued to see Dr. Bachelder for COPD and other conditions over the next two years, at least through September 25, 2007. (Admin. R. at 347, 354–55, Docket No. 5.) Over this two-year period, Dr. Bachelder saw Wallace for hot flashes, headaches, incontinence, hip pain, and ongoing anxiety (*id.* at 282); COPD, hypertension, joint disease, low back pain, and rotator cuff disease (*id.* at 234); and shortness of breadth and difficulty walking. (*Id.* at 306.) On June 10, 2007, Wallace had a follow-up visit

with Dr. Bachelder for COPD and rib fractures. (*Id.* at 302–03.) Dr. Bachelder noted

that Wallace was "doing fairly well with the exception of her cough [due to] smoking"

and noted Wallace had an order for oxygen. (*Id.* at 303.) However, on September 25,

2007, Dr. Bachelder wrote a letter addressed "To Whom it May Concern" stating that he

"believe[d] that [Wallace] has been significantly limited since 12/31/2004." (*Id.* at 354-

55.) He further wrote:

> At present I do believe that Ms. Wallace could tolerate sitting for up to six
> hours and probably walking or standing possibly up to two hours. I do not
> believe that given her pulmonary limitations that heavy lifting should be
> attempted ever, although she could probably lift less than 10 pounds up to
> one third of a work day. Given her pulmonary limitations I would probably
> avoid entirely climbing or balancing or stopping or crouching and do only a
> limited amount of bending, perhaps up to one third of the work day. I first
> saw Ms. Wallace in 8/2005 but given her history and what she described I
> do believe that her disability probably does date from 12/31/2004 onward.

(*Id.* at 354.) The letter further opined that Wallace could not lift twenty pounds or more,

and could not climb, balance, stoop, or crouch. (*Id.*)

On the same date, Dr. Bachelder completed a form entitled "Physical

Restrictions—FROM 12/31/2004 ONWARD." (*Id.* at 346.) Dr. Bachelder therein

indicated that Wallace could sit up to six hours in an eight-hour work day; stand or walk

up to two hours; lift up to ten pounds; bend up to one third of the work day; and sustain

or repeat neck movement up to two thirds of the work day. (*Id.*)

Wallace and her husband, Stephen Wallace, testified before the ALJ on October

23, 2007. Mr. Wallace testified that Wallace had not cared for her grandchildren

overnight since about 2003. (*Id.* at 57.) He stated that by 2004 he and his wife could not

drive as much as they used to and they had to limit visits with their grandchildren to

afternoons only.  (*Id.* at 56, 58.)  He further indicated that by 2003 or 2004 they could

only fish from the shore and that in 2005 they stopped buying fishing licenses altogether.

(*Id.* at 56, 58–59.)

The ALJ followed the required five-step analysis to determine whether Wallace

was disabled.[3]  At the first step, the ALJ determined that Wallace had not engaged in

substantial gainful activity during the period of August 1, 2000 through her date last

insured, December 31, 2004.  (*Id.* at 12.)  Next, the ALJ determined that Wallace had

severe impairment through the date last insured, including COPD secondary to tobacco

abuse, obesity, history of right arm carcinoma status post removal of the brachial muscle,

and degenerative changes in the cervical spine.  (*Id.*)  At the third step, the ALJ

concluded that Wallace's impairments did not meet or equal any of the impairments that

entitled her to a presumptive disability determination.  (*Id.* at 13.)  At step four of the

analysis, the ALJ determined that Wallace had residual functional capacity to perform

light work during the dates in question, but was unable to perform her past relevant work.

(*Id.*)  Finally, the ALJ determined that through the date last insured there were jobs that

existed in significant numbers in the national economy that Wallace could have

---

[3] *See* 20 C.F.R. § 404.1520(a)(4)(i) through (v).  Step one requires the ALJ to determine whether the claimant is engaging in substantial gainful activity.  Step two requires the ALJ to determine whether the claimant has a medically determinable impairment, or a combination of impairments, that is "severe."  Step three requires the ALJ to determine whether the claimant's impairments, or combination of impairments, meets or medically equals the criteria required for disability benefits.  This step may also require a determination as to the claimant's residual functional capacity.  *Id.* § 404.1520(d)-(e).  Step four requires the ALJ to determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work.  The fifth, and final step, requires the ALJ to determine whether that claimant is able to do any other work, and, if not, whether the SSA has provided evidence that other work exists in significant numbers in the national economy that the claimant could perform.  *Id.* §§ 404.1520(g), 404.1512(g), 404.1560(c).

performed.  (*Id.* at 17.)  Consequently, the ALJ denied Wallace's claims for disability insurance benefits.  (*Id.* at 18.)

On February 8, 2010, Wallace brought the instant action seeking review of the Commissioner's final decision.  (Compl., Docket No. 1.)  Wallace subsequently filed a motion for summary judgment arguing the ALJ erred in failing to give controlling weight to Dr. Bachelder's opinions, and that the ALJ's assessment of Wallace's dominant arm dexterity was not supported by substantial record evidence.  (Docket No. 12.)  The Commissioner also filed a motion for summary judgment, urging the Court to affirm the denial of benefits.  (Docket No. 19.)

**DISCUSSION**

**I.      STANDARD OF REVIEW**

This Court's review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Maresh v. Barnhart,* 438 F.3d 897, 898 (8th Cir. 2006).  Substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000).  The Court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Vossen v. Astrue,* 612 F.3d 1011, 1015 (8th Cir. 2010).  However, reweighing the evidence is not permitted. *Flynn v. Chater,* 107 F.3d 617, 620 (8th Cir. 1997).  Therefore, even if Wallace's impairments support a claim for disability insurance benefits, the Court **must** affirm if

there is substantial evidence to support the ALJ's conclusion to the contrary.  *See id.*

This Court cannot reverse the Commissioner's decision "merely because substantial

evidence exists in the record that would have supported a contrary outcome."  *Young v.*

*Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).


## II.    DR. BACHELDER'S OPINIONS

Wallace objects to the ALJ's determination that she was capable of performing

light work, specifically arguing that controlling weight should have been given to Dr.

Bachelder's opinions to the contrary.   This argument implicitly suggests that Dr.

Bachelder's retrospective opinions as to Wallace's limitations from December 31, 2004

onward should be treated as dispositive of her capacity from August 1, 2000 through

December 31, 2004.

A treating physician's opinion is given controlling weight if it is "well-supported

by medically acceptable clinical and laboratory and diagnostic techniques and **is not**

**inconsistent with other substantial evidence in the record**."  *Leckenby v. Astrue*, 487

F.3d 626, 632 (8th Cir. 2007) (emphasis added) (alteration and internal quotation marks

omitted) (citing 20 C.F.R. § 404.1527(d)(2)).   The opinions of non-treating physicians,

however, "who have attempted to evaluate the claimant without examination do not

normally constitute substantial evidence on the record as a whole."  *Vossen*, 612 F.3d at

1016.

Dr. Bachelder neither saw nor treated Wallace during the time period in question,

and only first examined her in August 2005.  It was not until 2007 that he opined that

Wallace had been significantly limited **since** December 31, 2004.  He made no specific conclusions as to her condition **before** that date and going back to August 1, 2000.  Since Dr. Bachelder did not treat Wallace during the time period in question, as a non-treating physician his opinions do not constitute substantial evidence for the purposes of determining medical disability.  *Id.*  As such, the ALJ was under no requirement to give his opinions controlling weight.

However, even if Dr. Bachelder is considered a treating physician for the purposes of the Court's inquiry, his opinions as to her limitations from 2000 to 2004 are nonetheless inconsistent with substantial evidence in the record and, as such, do not command controlling weight.  *Leckenby*, 487 F.3d at 632.  Specifically, the record shows that between August 1, 2000 and December 31, 2004, Wallace received medical treatment for various symptoms and conditions, but none created debilitating impairments.  In 2000, Wallace suffered sudden onset of left arm limitation, but she reported no pain and her condition had drastically improved by her next visit.  Months later, Wallace suffered a urinary tract infection that was treated and resolved within three weeks.  In 2003, Wallace had several bouts of sinusitis and a case of bronchitis that were diagnosed and treated.  While Wallace stopped caring for her grandchildren overnight in 2003, and by 2004 Wallace had to cut back on her activities, she could still visit with her grandchildren and she continued to fish until 2005.

As the ALJ properly noted, "the objective record prior to the date last insured is minimal at best, and reveals virtually no specific treatment for COPD despite the claimant's allegations of severe breathing problems[,]" (*id.* at 15), for which she sought

medical treatment.   The ALJ reasoned that if Wallace was capable of light sedentary work in 2007 despite requiring oxygen, it was reasonable that she could perform greater activity during the earlier years in question.   (*Id.*)   Furthermore, the objective record reveals no evidence that Wallace's right arm could not act as a "helper" or that her left arm was severely impaired.[4]   In sum, there is substantial evidence inconsistent with Dr. Bachelder's opinion that Wallace was only capable of sedentary activity from August 1, 2000 through December 31, 2004.   Consequently, the ALJ neither erred in affording minimal weight to Dr. Bachelder's opinions nor in arriving at the conclusion that Wallace was not disabled during this time.

Wallace argues that the ALJ had a duty to obtain additional medical evidence to determine whether Dr. Bachelder's opinions were entitled to controlling weight, given it based the determination, in part, on an absence of evidence.   However, the ALJ's duty to develop the record does not require that the ALJ "seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (citing *Snead v. Barnhart,* 360 F.3d 834, 839 (8th Cir. 2004)).

Wallace relies on *Bowman v. Barnhart*, 310 F.3d 1080 (8th Cir. 2002), to assert her case triggered a duty on the part of the ALJ to seek such clarifying information.   However, *Bowman* is distinguishable since Bowman's physician of thirty years kept only

---

[4] The ALJ's assessment of the degree of limitation of the use of Wallace's right arm was also supported by Dr. Chapman's assessment that she had "totally recovered" in 2000. (Admin. R. at 205, Docket No. 5.)   While Wallace cites record evidence from 1992-95 as to limitations regarding her arm, the Court considers Dr. Chapman's opinions controlling since he treated her for that condition and for other conditions thereafter until 2005. *Leckenby*, 487 F.3d at 632.

cursory medical notes, merely listing impairments and medications, without any elaboration as to her limitations. *Id.* at 1085. Further, Bowman's doctor never made an assessment of her functional capacity, thus warranting development of the record. *Id.* (citing *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000) ("In spite of the numerous treatment notes . . . not one of [claimant's] doctors was asked to comment on his ability to function in the workplace." (omissions and alternation original))).

In contrast, Wallace's medical records from 2000 through 2004 indicate, in narrative fashion, Wallace's symptoms and conditions, and their effect on her physical capacity. That the objective record reveals little to no treatment of COPD from 2000 to 2004 does not trigger a duty for the ALJ. Wallace failed to present substantial evidence of debilitating COPD, or other conditions, during that time and, ultimately, the burden rests with Wallace to develop such a record. *Stormo*, 377 F.3d at 806 ("The burden of persuasion to prove disability and to demonstrate [residual functional capacity] remains on the claimant . . . .").

The Court does not dispute that Wallace suffers significant physical limitations. However, after thorough review of the record, the Court finds substantial evidence to support the ALJ's findings regarding Wallace's functional capacity between August 1, 2000 and December 31, 2004. The Court finds the evidence on which the ALJ relied sufficient to support its conclusion.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, the Court **OVERRULES** Wallace's objections and **ADOPTS** the Report and Recommendation of the Magistrate Judge dated February 24, 2011 [Docket No. 26].   **IT IS HEREBY ORDERED** that:

1.      Plaintiff Barbara Wallace's Motion for Summary Judgment [Docket No. 11] is **DENIED.**

2.      Defendant Michael J. Astrue's Motion for Summary Judgment [Docket No. 18] is **GRANTED**.

3.      This case is **DISMISSED with prejudice**.


   **LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:   May 23, 2011                         _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                     United States District Judge